**KANTROWITZ, GOLDHAMER & GRAIFMAN**
Gary S. Graifman
210 Summit Avenue
Montvale, New Jersey 07645
(201) 391-7000

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHARLES J. GALLIC, Derivatively on Behalf of MEDAREX, INC., | DERIVATIVE ACTION |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| MICHAEL A. APPELBAUM, RANDALL T. CURNOW, YASHWANT M. DEO, DONALD L. DRAKEMAN, LISA N. DRAKEMAN, PATRICIA M. DANZON, IRWIN LERNER, NILS LONBERG, W. BRADFORD MIDDLEKAUFF, RONALD J. SALDARINI, CHRISTIAN S. SCHADE, CHARLES R. SCHALLER and JULIUS A. VIDA, | JURY TRIAL DEMAND |
| Defendants. | |
| and | |
| MEDAREX, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECTIONS 10(B) AND 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, ACCOUNTING, RESCISSION AND FOR CONSTRUCTIVE TRUST**

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by shareholders of Medarex, Inc. ("Medarex" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that have caused substantial losses and other damages, such as damage to reputation and goodwill, to Medarex.  On behalf of Medarex, this action seeks, among other things, damages, corporate governance reforms, an accounting, rescission, restitution, and the declaration of a constructive trust to remedy defendants' violations of state law.

## Defendants' Illegal Backdating Practices

2.      Dating back to at least 1996, defendants have caused or allowed Medarex insiders to manipulate their stock-option grant dates so as to secretly maximize their profits from the stock options.  Specifically, certain Medarex insiders changed their respective stock-option grant dates to take advantage of lower exercise prices than the price on the actual grant date.  The price of Medarex shares on the reported option-grant date, therefore, was lower than the share price on the actual day options were issued.  Thus, the backdating of these stock options brought Medarex insiders an instant paper gain.  By engaging in this scheme, defendants were able to conceal from investors that the Company was neither recording in this scheme nor recording material compensation avoided as a result of this scheme, consequently causing Medarex's net income and earnings per share to be materially

2

overstated.  By 2002, these defendants have allowed themselves and others the opportunity to acquire over 3.4 million backdated options of Medarex stock, potentially yielding them millions  of dollars in illicit compensation through their exercise.

3.     The traditional rationale behind the granting of stock options is to align a company's officers, directors and employees with the interests of the company.  When an option is granted at or above full market value, that option is worthless until the grantee builds value in the option by building value in the company.  Thus, the company and the insider both share in the value created.  The backdating of options, however, subverts this principle because the instant paper gain of a backdated stock option benefits only the insider.

4.     The granting of stock options to Medarex insiders, at all times relevant hereto, was controlled by six stock options plans: the Medarex 1996 Stock Option Plan (the "1996 Plan"); the Medarex 1997 Stock Option Plan (the "1997 Plan"); the Medarex 1999 Stock Option Plan (the "1999 Plan"); the Medarex 2000 Stock Option Plan (the "2000 Plan"); the Medarex 2001 Stock Option Plan (the "2001 Plan"); and the Medarex 2002 Stock Option Plan (the "2002 Plan") (collectively the "Stock Options Plans").  Defendants were required under federal law to present these plans to Medarex's shareholders for approval.  Each of these plans contained restrictions on the exercise price of options granted under the plans.  Specifically, the 1996 Plan provides that "The purchase price per share of the Stock purchasable under a stock option shall be determined by the Committee, but will not be less than 100% of the fair market value of the Stock on the date of the grant of the option...."  The 1997 Plan, 1999 Plan, 2000 Plan, 2001 Plan, and 2002 Plan each contain identical language as to exercise price. Thus, defendants' backdating practices, which resulted in below-fair-market-value-option grants, violated the 1996 Plan, 1997 Plan, 1999 Plan, 2000 Plan, 2001 Plan, and 2002 Plan.  Further

3

defendants' backdating practices resulted in truncated stock-option vesting periods, a further violation of these plans.  Accordingly, because the plans were violated, the backdated options granted under these plans must be cancelled and declared void.

5.     The Stock Option Plans were administered by the Compensation Committee, Stock Option Committee, and New Compensation Committee, each comprised of members of Medarex's Board of Directors.  Individually, these Stock Option Plans specifically spelled out the responsibility to administer as follows: "the Board of Directors of the Corporation shall designate a Committee of not less that two (2) Directors who shall serve at the pleasure of the Board…. The Committee shall have full power and authority…to grant to Eligible Persons… (i) stock options to purchase shares, (ii) stock appreciation rights, (iii) restricted stock, (iv) deferred stock, or (v) other Stock-based awards permitted." Accordingly, the Compensation Committee, Stock Option Committee, and the New Compensation Committee were directly responsible for the backdating and violations of the plans.

6.     Further, defendants have caused or allowed Medarex: (i) to file materially false and misleading financial statements that materially understated its compensation expenses and materially overstated its quarterly and annual net income and earnings per share; and (ii) to make disclosures in its periodic filings and proxy statements that falsely portrayed Medarex's options as having been granted at exercise prices equal to the fair market value of Medarex's common stock on the date of the grant.  Under Generally Accepted Accounting Principles ("GAAP"), the instant paper gain received from backdated stock options was equivalent to paying extra compensation and was thus a cost to Medarex.  These costs were also not properly recorded.  In turn, since these costs were not properly recorded, Medarex's profits were overstated.  Accordingly, a restatement of Medarex's past financial results will be necessary to correct for these improprieties.

4

7.    In addition, the backdating of stock options can have severe tax consequences.  While stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not qualify for that treatment.  In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants.  For example, a company is allowed for performance-based stock options (generally granted to the five highest-paid executives) to take a tax deduction on that full amount *provided that the options were granted at the market price.* Backdating, however, automatically disqualifies those options from receiving the tax break—instead, a company's tax deduction would be capped at $1 million for each of the top five executives.  In September 2006, in response to these types of tax implications, the Internal Revenue Service ("IRS") placed criminal investigators on an options-backdating task force formed by the U.S. Attorney for the Northern District of California.  That task force also includes the Federal Bureau of Investigation ("FBI").

## The "Outrageous" Backdating Scandal

8.    The backdating scandal is outrageous as evidenced by the following commentary: Lynn Turner, former Chief Accountant of the U.S. Securities and Exchange Commission ("SEC"), has described stock option backdating as follows:  "It's like allowing people to place bets on a horse race after the horses have crossed the finish line..."  In a recent article published by *The Wall Street Journal*, Arthur Levitt, a former chairman of the SEC was quoted as stating that stock-option backdating "represents the ultimate in greed."  Further, Levitt stated: "It is stealing, in effect.  It is ripping of shareholders in an unconscionable way."  San Diego analyst Michael Cohen later made similar comments published by Bloomberg: "Stockholders are hit twice...first you're stolen from, then the stock goes down when the theft is uncovered."  Senator Chuck Grassley, Chairman of the Senate

5

Finance Committee, concurs.  He referred to stock-option backdating as "disgusting and repulsive." Grassley stated: "It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.'  Even worse in this situation, most of the perpetrators had already gotten 'theirs' in the form of six and seven-figure compensation packages of which most working Americans can only dream."

9.      On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CNBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent."

10.     On July 20, 2006, the SEC announced it had filed civil charges against two former Brocade Communications Systems, Inc. executives for illegally manipulating stock-option grant dates.  Criminal charges were brought simultaneously, indicating the serious view taken by governmental agencies with respect to improperly backdated options.

11.     In a news conference detailing the charges, SEC Chairman Christopher Cox proclaimed that "the full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating."  He disclosed that additional cases likely would be brought in the "coming weeks and months."  In later testimony before a Senate committee, Cox indicated that the SEC is currently investigating more than 100 companies, a large percentage of which are tech companies, meaning many more executives could face criminal charges related to manipulating options.

12.     Government disgust at stock-option backdating reached a new level on July 31, 2006, when the FBI issued an arrest warrant for Kobi Alexander ("Alexander")—former Chief Executive Officer ("CEO") of Comverse Technology, Inc. ("Comverse").  Alexander is charged with conspiracy

related to backdated stock options.  Alexander was considered a fugitive by the U.S. Government and had transferred more than $57 million from the U.S. to account in Israel to conceal funds from the government.  On September 27, 2006, police in Namibia, a country in southern Africa, arrested Alexander.

### Backdating Disclosures at Medarex and Resulting Damages

13.     On May 24, 2006, in a Form 8-K filed with the SEC, Medarex disclosed to the public an informal inquiry by the SEC into Medarex's stock option granting practices, stating:

> Medarex, Inc. has received a letter of informal inquiry from the Securities and Exchange Commission (SEC) requesting documents related to Medarex's stock option grants and practices.

14.     On June 15, 2006, in a subsequent Form 8-K filed with the SEC, Medarex announced that it had initiated an internal investigation into its stock option granting practices and had appointed an outside director to oversee.

15.     In the same June 15, 2006 Form 8-K mentioned above, Medarex further disclosed its receipt of a grand jury subpoena from the U.S. Attorney's Office, District of New Jersey, referencing information and documentation substantially similar to that requested by the SEC.

16.     On November 6, 2006, Medarex issued a Form 8-K disclosing the findings of the internal investigation.  Importantly, the investigation uncovered that "…prior to the 2002 effective date of the Sarbanes-Oxley legislation, the Company had a practice, in many instances, of dating its stock option grants and restricted stock grants as of dates on which the stock price was relatively low, without disclosing the selection in its public filings and without taking a compensation charge."

17.     Defendants' accounting treatment of over $37 million of improperly accounted for stock option expenses is dependent on their conclusion that these errors are immaterial.  Defendants'

materiality opinion, however, will likely not be shared by the SEC.  The SEC and applicable accounting rules dictate that issues related to the integrity of management are always material. Defendants' participation in a scheme to backdate options and pay themselves secret paper profits definitely speaks to their integrity.

18.     Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *In re TSC Industries,*  426, U.S. 438, 449 (1976) and in SEC Staff Accounting Bulletin No. 99 ("SAB 99"), released August 12, 1999.  The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the...fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available." 426 U.S. at 449.  SAB 99 further explains that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.

19.     SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone.  Qualitative factors that can make a misstated fact material include, among others:

(a)     whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)     whether the misstatement arises from an item "capable of precise measurement";

(c)     whether the misstatement masks a change in earnings;

(d)     whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)     whether the misstatement affects the registrant's compliance with regulatory requirements.

20.     The improper backdating of stock options is material under each criterion above individually, and is material under all of the criteria collectively.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about Medarex.  That is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's.  As the SEC ruled in the administrative case *In re Franchard Corp.,* the integrity of a company's management "is always a material factor."  42 S.E.C. 163 (1964).  Second, the improper backdating increased management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation.  Third, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured.  Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses.  Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability.  Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses.  Thus, defendants' illegal stock-option backdating practices are material under these qualitative factors.

21.     Moreover, under applicable accounting rules, a financial misstatement that appears immaterial as to a single reporting period can have a cumulative material impact on other periods.  In such a situation, the misstatement must be corrected, according to SEC Staff Accounting Bulletin No. 108 ("SAB 108").  Although SAB 108 is dated September 13, 2006, it draws on years of prior

accounting literature and practice that defendants must take into account in correcting Medarex's financials. Thus, defendants cannot hide the materiality of their backdating practices by spreading the errors related to those practices over several financial periods and can not claim that "charges are not material to [Medarex's] financial statements in any of the periods in which such charges would have been related....."

22.     Thus, under applicable SEC and accounting rules and pronouncements, Medarex will likely be required to file a restatement to correct for the $37 million in improperly accounted for stock option expenses. Defendants can not hide those errors in reclassifications and expense charges.

23.     Plaintiff's own investigation of Medarex's prior option grants has revealed several option grants that were blatantly dated on, or very close to, the lowest share price for the period in which they were granted. Further, these suspicious grants span from at least 1996 until 2002. Accordingly, this action is necessary to end these option-backdating practices and to restore assets to the Company that have been squandered via the payment of undisclosed and undeserved compensation to corporate insiders.

24.     As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

        (a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

        (b)     costs incurred from responding to potential subpoenas and requests for information from government agencies including the SEC;

        (c)     costs incurred from potential fines in connection with governmental investigations;

- 10 -

(d)    costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)    enormous tax liabilities from improper deductions taken on backdated option grants;

(f)    costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(g)    costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(h)    costs incurred from directing manpower to correct Medarex's defective internal controls; and

(i)    costs incurred from directing manpower to potentially restate Medarex's prior financial results to correct for the improperly dated stock option grants.

25.    A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 8%.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 in that plaintiff's claims arises in part under the Constitution and laws of the United States, including the Securities and Exchange Act of 1934.

27.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction pursuant to 28

U.S.C. §1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

28.     Venue is proper in this Court  pursuant to 28 U.S.C. §1391(A) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Medarex occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

29.     Plaintiff Charles J. Gallic is, and was at times relevant hereto, an owner and holder of Medarex common stock.  Currently, plaintiff owns 18,000 shares.  Plaintiff is a citizen Florida.

30.     Nominal defendant Medarex is a New York corporation with its principal executive offices located at 707 State Road, Princeton, New Jersey 08540.  Medarex operates as a national chain of retail stores that sell domestic merchandise including bed linens, bath items, kitchen textiles, home furnishings and other housewares.

31.     Defendant Donald L. Drakeman ("D. Drakeman") has served as the Company's President, the Company's Chief Executive Officer, and as a director of the Company since 1987. Because of defendant D. Drakeman's positions, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, and reports and other information provided to him in connection therewith, that Medarex insiders were improperly

backdating stock option grants to maximize their personal profits.  D. Drakeman received at least 1,069,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases.  Accordingly, upon information and belief, plaintiff alleges that D. Drakeman backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders.  D. Drakeman received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
| --- | --- | --- |
| 4/24/1996 | $6.44 | 20,000 |
| 9/4/1997 | $4.50 | 71,000 |
| 10/31/1999 | $6.86 | 112,000 |
| 10/13/2000 | $45.20 | 46,000 |
| 1/9/2001 | $27.81 | 120,000 |
| 9/19/2001 | $12.91 | 400,000 |
| 7/10/2002 | $6.37 | 300,000 |

32.     Defendant Michael A. Appelbaum ("Appelbaum") has served as a director of the Company since April 1991.  Previously, Appelbaum served as the Company's Executive Vice President, Finance and Administration, Treasurer, and Chief Financial Officer from July 1991 until October 2002.  Because of defendant Appelbaum's positions, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profits.  Appelbaum received at least 262,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases.  Accordingly, upon information and belief, plaintiff alleges that Appelbaum backdated these stock options and received

- 13 -

illegal compensation from Medarex that was not disclosed to the Company's shareholders. Appelbaum received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 4/24/1996 | $6.44 | 40,000 |
| 9/4/1997 | $4.50 | 64,000 |
| 10/31/1999 | $6.86 | 112,000 |
| 10/13/2000 | $45.20 | 46,000 |

33.     Defendant Nils Lonberg ("Lonberg") currently serves as the Company' Senior Vice President and Senior Scientific Director.  Because of defendant Lonberg's position, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profit.  Lonberg received at least 462,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases.  Accordingly, upon information and belief, plaintiff alleges that Appelbaum backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders.  Lonberg received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 10/31/1999 | $6.86 | 112,000 |
| 1/9/2001 | $27.81 | 50,000 |
| 9/19/2001 | $12.91 | 100,000 |

| | | |
|---|---|---|
| 7/10/2002 | $6.37 | 200,000 |

34.     Defendant W. Bradford Middlekauff ("Middlekauff") currently serves as the Company's Senior Vice President, General Counsel, and Secretary.  Because of defendant Middlekauff's position, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profit.  Middlekauff received at least 350,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases.  Accordingly, upon information and belief, plaintiff alleges that Middlekauff backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders.  Middlekauff received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 1/9/2001 | $27.81 | 50,000 |
| 9/19/2001 | $12.91 | 100,000 |
| 7/10/2002 | $6.37 | 200,000 |

35.     Defendant Christian S. Schade ("Schade") currently serves as the Company's Senior Vice President, Finance and Administration, and Chief Financial Officer.  Because of defendant Schade's position, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to

maximize their personal profit. Schade received at least 680,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases. Accordingly, upon information and belief, plaintiff alleges that Schade backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders. Schade received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 10/13/2000 | $45.20 | 300,000 |
| 1/9/2001 | $27.81 | 30,000 |
| 9/19/2001 | $12.91 | 100,000 |
| 7/10/2002 | $6.37 | 250,000 |

36.   Defendant Randall T. Curnow ("Curnow") formerly served as the Company's Senior Vice President and Chief Medical Officer. Because of defendant Curnow's position, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profit. Curnow received at least 680,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases. Accordingly, upon information and belief, plaintiff alleges that Curnow backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders. Curnow received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 4/24/1996 | $6.44 | 120,000 |
| 9/4/1997 | $4.50 | 8,000 |
| 10/31/1999 | $6.86 | 25,000 |

37.    Defendant Yashwant M. Deo ("Deo") formerly served as the Company's Senior Vice President – Operations, Research and Development and Regulatory Compliance.  Because of defendant Deo's position, he knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profit.  Deo received at least 274,000 options that were purportedly dated or very close to the lowest stock price for the month during which the options were granted or before significant share price increases.  Accordingly, upon information and belief, plaintiff alleges that Deo backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders.  Deo received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 4/24/1996 | $6.44 | 20,000 |
| 9/4/1997 | $4.50 | 29,000 |
| 10/31/1999 | $6.86 | 50,000 |
| 1/9/2001 | $27.81 | 75,000 |
| 9/19/2001 | $12.91 | 100,000 |

38.    Defendant Lisa N. Drakeman ("L. Drakeman") formerly served as the Company's Vice President.  Because of defendant L. Drakeman's position, she knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profit.  L. Drakeman received at least

274,000 options that were purportedly dated on or very close to the lowest stock price for the month during which the options were granted or before significant share price increases. Accordingly, upon information and belief, plaintiff alleges that L. Drakeman backdated these stock options and received illegal compensation from Medarex that was not disclosed to the Company's shareholders. L. Drakeman received the following stock option grants:

| Purported Date of Grant | Exercise Price | Number of Options |
| --- | --- | --- |
| 4/24/1996 | $6.44 | 20,000 |
| 9/4/1997 | $4.50 | 57,000 |
| 10/31/1999 | $6.86 | 112,000 |

39.     Defendant Patricia M. Danzon ("Danzon") currently serves as a director of the Company. Because of defendant Danzon's position, she knew or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profits.

40.     Defendant Irwin Lerner ("Lerner") has served as a director of the Company's since 1995. Lerner has served as a member of the Company's audit committee (the "Audit Committee") since 1998, as a member of the Company's compensation committee (the "Compensation Committee") since 1997, as a member of the Company's stock option committee the "Stock Option Committee") since 1997, as a member of the Company's compensation and organization committee1 (the "New

---

1 The New Compensation Committee was formed on April 7, 2003 when the compensation Committee and Stock Option Committee were merged into one committee.

Compensation Committee") since 2003.  Because of defendant Lerner's positions, he knew or should

have known, via access to internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and Board meetings and committees

thereof and via reports and other information provided to him in connection therewith, that Medarex

insiders were improperly backdating stock option grants to maximize their personal profit.

41.     Defendant Ronald J. Saldarini ("Saldarini") currently serves as a director of the

Company.  Because of defendant Saldarini's position, he knew or should have known, via access to

internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at management and Board meetings and committees thereof and via reports and

other information provided to him in connection therewith, that Medarex insiders were improperly

backdating stock option grants to maximize their personal profit.

42.     Defendant Charles R. Schaller ("Schaller") has served as a director of the Company

since 1987.  Schaller has served as a member of the Audit Committee, Compensation Committee,

Stock Option Committee, and New Compensation Committee at all relevant times. Because of

defendant Schaller's position, he knew or should have known, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at

management and Board meetings and committees thereof and via reports and other information

provided to him in connection therewith, that Medarex insiders were improperly backdating stock

option grants to maximize their personal profit.

43.     Defendant Julius A. Vida ("Vida") has served as a director of the Company since 1994.

 Schaller has served as a member of the Compensation Committee, Stock Option Committee, and New

Compensation Committee at all relevant times hereto.  Because of defendant Vida's position, he knew

or should have known, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith, that Medarex insiders were improperly backdating stock option grants to maximize their personal profit.

44.    Collectively, defendants Lerner and Schaller are referred to herein as the "Audit Committee Defendants," and defendants Lerner, Schaller, and Vida are referred to herein as the "Compensation Committee Defendants."  Together with the Audit Committee Defendants and the Compensation Committee Defendants, defendants Appelbaum, Danzon, D. Drakeman, and Saldarini are referred to herein as the "Director Defendants."

45.    Collectively, defendants Curnow, Deo, and L. Drakeman are referred to herein as the "Former Officer Defendants," and together with defendants Appelbaum, D. Drakeman, Lonberg, Middlekauff, and Schade, the "Option Recipient Defendants."

46.    Collectively, defendants D. Drakeman, Lonberg, Middlekauff, and Schade are referred to herein as the "Officer Defendants."

47.    Collectively, the Director Defendants, Officer Defendants and the Former Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

48. By reason of their positions as officers, directors and/or fiduciaries of Medarex and because of their ability to control the business and corporate affairs of Medarex, the Individual Defendants owed Medarex and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Medarex in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Medarex and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

49. Each director and officer of the Company owes to Medarex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the compensation paid to its executives, directors an employees. These disclosures necessarily include the value of stock options granted to the Company's insiders.

50. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Medarex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions with Medarex, each of the Individual Defendants had access to adverse, non-public information about the financial condition and improper representations of Medarex.

51.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Medarex, and was at all times acting within the course and scope of such agency.

52.    To discharge their duties, the offices and directors of Medarex were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the offices and directors of Medarex were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide accurate disclosures of the Company's financials and to avoid wasting the Company's assets;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results, and ensuring that the Company maintained an adequate system of internal controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to Mederex's internal controls, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that Mederex was properly handling its tax liabilities;

(f)     ensure that Mederex's internal controls are sufficient to prevent backdating or other manipulations of stock options granted to Mederex insiders; and

(g)     ensure that Medarex was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

53.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty and good faith, and the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of the Company's property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mederex, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders. Furthermore, the Individual Defendants were, or should have been, aware that this derelict conduct posed a risk of serious injury to the Company.  Moreover, Each Individual Defendant's conduct has been ratified by the remaining Individual Defendants via each Individual Defendants' knowledge of and access to Company information, as explained in paragraphs thirty-three through forty-five *infra*, and to each Individual Defendants' duties owed to the Company, as explained in paragraphs fifty through fifty-five *infra*.

54.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such improper actions.  As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)     costs incurred from responding to potential subpoenas and requests for information from government agencies including the SEC;

(c)     costs incurred from potential fines in connection with governmental investigations;

(d)     costs incurred from increased Directors and Officer's Insurance ("D&O Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)     enormous tax liabilities from improper deductions taken on backdated option grants;

(f)     costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(g)     costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(h)     costs incurred from directing manpower to correct BBB's defective internal controls; and

(i)     costs incurred from directing manpower to potentially restate BBB's prior financial results to correct for the improperly dated stock option grants.

55.     A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 8%.

## THE BOARD'S DUTY TO
## ADMINISTER THE STOCK OPTION PLANS

56.    The 1996 Plan, 1997 Plan, 1999 Plan, 2000 Plan, 2001 Plan, and 2002 Plan were administered by the Compensation Committee, Stock Option Committee, and the New Compensation Committee each comprised of members of Medarex's Board of Directors.   Every one of the aforementioned Plans specifically spelled out this responsibility as follows: "the Board of Directors of the Corporation shall designate a Committee of not less that two (2) Directors who shall serve at the pleasure of the Board….   The Committee shall have full power and authority…to grant to Eligible Persons… (i) stock options to purchase shares, (ii) stock appreciation rights, (iii) restricted stock, (iv) deferred stock, or (v) other Stock-based awards permitted."  Accordingly, the Compensation Committee and Stock Option Committee, or the New Compensation Committee,  were directly responsible for the backdating and violations of the plans.

57.    The Audit Committee of the Board is responsible by its charter for overseeing Mederex's accounting and financial reporting processes.

58.    Accordingly, defendants Appelbaum, Danzon, D. Drakeman, Saldarini, Lerner, Schaller, Vida, who were directors on the Board or members of the Stock Option Committee, Compensation Committee or Audit Committees between 1996 and 2002 and were directly responsible for the stock-option backdating improprieties.  Thus, these defendants are liable to Medarex together with the Option Recipient Defendants who received backdated options.

59.    The Director Defendants who joined the Board after 2002 are also liable, on account of concealing or failing to uncover to the Company until September 20, 2006 the remaining Individual Defendants' illegal backdating practices, for their improprieties in connection with the illegally backdated stock option grants.  These defendants knew, consciously disregarded, were reckless and

grossly negligent in not knowing, or should have known, due to their fiduciary duties outlined above, about the illegal backdating practices.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

60.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

61.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that Company insiders were improperly backdating their stock option grants; (ii) conceal the fact that as a result of the improperly backdated stock option grants, the Company's financial statements were inaccurate; (iii) maintain the Individual Defendants' executive and directorial positions at Medarex and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iv) deceive the shareholders of Medarex, regarding the level of compensation being paid to the Company's insiders and the Company's financial condition and future business prospects.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

62.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time the Individual Defendants caused the Company to conceal the true fact that Medarex was misrepresenting its financial results and that Medarex insiders were improperly backdating their stock option grants.

- 26 -

63.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to grant themselves and other insiders undisclosed and unaccounted for compensation in the form of backdated stock option grants and to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, insider trading abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

64.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

66.     According to its public filings, Medarex is a biopharmaceutical company focused on the discovery, development, and potential commercialization of fully human antibody-based therapeutic products.

67.     On March 18, 2006, *The Wall Street Journal* published an article entitled: "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck - or something else?"  The article stated in pertinent part:

On a summer day in 2002, shares of Affiliated Computer Services Inc. Sank to their lowest level in a year. Oddly, that was good news for Chief Executive Jeffrey Rich.

His annual grant of stock options was dated that day, entitling him to buy stock at that price for years. Had they been dated a week later, when the stock was 27% higher, they'd have been far less rewarding. It was the same through much of Mr. Rich's tenure: In a striking pattern, all six of his stock-option grants from 1995 to 2002 were dated just before a rise in the stock price, often at the bottom of a steep drop.

Just lucky? A wall Street Journal analysis suggests the odds of this happening by chance are extraordinarily remote – around one in 300 billion. The odds of winning the multistate Powerball lottery with a $1 ticket are one in 146 million.

Suspecting such patterns aren't due to chance, the Securities and Exchange Commission is examining whether some option grants carry favorable grant dates for a different reason: They were backdated. The SEC is understood to be looking at about a dozen companies' option grants with this in mind.

The journal's analysis of grant dates and stock movements suggests the problem may be broader. It identified several companies with wildly improbable option-grant patterns. While this doesn't prove chicanery, it shows something very odd: Year after year, some companies' top executives received options on unusually propitious dates.

The analysis bolsters recent academic work suggesting that backdating was widespread, particularly from the start of the tech-stock boom in the 1990s through the Sarbanes-Oxley corporate reform act of 2002. If so, it was another way some executives enriched themselves during the boom at shareholders' expense. And because options grants are long-lived, some executives holding backdated grants from the late 1990s could still profit from them today.

* * *

Stock options give recipients a right to buy company stock at a set price, called the exercise price or strike price. 'The right usually doesn't vest for a year or more, but then it continues for several years. The exercise price is usually the stock's 4 p.m. price on the date of the grant, an average of the day's high and low, or the 4 p.m. price the day before. Naturally, the lower it is, the more money the recipient can potentially make someday by exercising the options.

Which day's price the options carry makes a big difference. Suppose an executive gets 100,000 options on a day when the stock is at $30. Exercising them after it has reached $50 would bring a profit of $20 times 100,000, or $2 million. But

- 28 -

if the grant date was a month earlier and the stock then was at, say, $20, the options would bring in an extra $1 million.

68.    On May 5, 2006, President George W. Bush stated in an interview on the Kudlow & Company show airing on CDBC that "overcompensating or trying to backdate things is bad for America, and there ought to be consequences when people don't tell the truth and are not transparent.    **DEFENDANTS' ILLEGAL BACKDATING PRACTICES**

69.    Dating back to at least 1996, the Individual Defendants have caused or allowed Medarex insiders to manipulate their stock option grant dates so as to illegally maximize their profits from the stock options.  Specifically, Company insiders changed their respective stock option grant dates to take advantage of exercise prices lower than the price on the actual grant date.  The price of Medarex shares on the reported option grant date, therefore, was lower than the share price on the actual day the options were issued, thus providing defendants with more favorably priced options. The Medarex Board, in turn, approved the grants of the options to Medarex insides even though those options were improperly backdated.

70.    Further, the backdating of options granted to corporate insiders brought an instant paper gain to these insiders because the options were priced below the stock's fair market value when they were actually awarded.   Under GAAP, this instant paper gain was equivalent to extra compensation and was thus a cost to Medarex.  Accordingly, since Medarex failed to include in its financial results the costs associated with this extra compensation, its profits were overstated during the fiscal periods in which the options were granted.  A restatement of Medarex's past financial results will be necessary to correct for these improprieties.

71.    In addition to breaches of fiduciary duty and accounting issues, the backdating of stock options can have severe tax consequences.  While stock options generally qualify for favorable

tax treatment, options issued at a discount to the market price to not qualify for that treatment.  In effect, backdating allows these "in-the-money" options to appear in regulatory filings as if they were ordinary grants.  For example, a company is allowed for performance-based stock options (generally granted to the five highest-paid executives) to take a tax deduction on that full amount **provided that the options were granted at the market price**.  Backdating, however, automatically disqualifies those options from receiving the tax break.  Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

72.     In light of these serious potential tax-related ramifications, the IRS is now examining a multitude of companies under investigation for backdating stock options to determine whether they owe millions of dollars in unpaid taxes.  On July 28, 2006, *The New York Times* published an article entitled "I.R.S. Reviewing Companies in Options Inquiries," which stated:

> The Internal Revenue Service is examining as many as 40 companies ensnared in various stock options investigations to determine whether they owe millions of dollars in unpaid taxes.
>
> In the last few weeks, the agency has directed its corporate auditors to start reviewing the tax returns of dozens of executives and companies, which ay have improperly reported stock option grants. These preliminary investigations are expected to take months, but if there is early evidence of widespread tax trouble, I.R.S. officials said they were prepared to step up their effort.
>
> "Where there are indications of mischief, we want t now look at those cases and see if they complied with tax laws," said Bruce Ungar, the agency's deputy commissioner for large and midsize businesses.  "It is possible that they are compliant, but the early indication is that there is a good likelihood there is some noncompliance.

"If this is a big problem, we will apply more resources," he added.

The I.R.S. auditors are focusing on the potential tax obligations from backdated stock options that have been cashed out since 2002. Federal rules bar the I.R.S. from opening cases that are more than three years old. Still, tax lawyers estimate the agency could reap hundreds of millions of dollars from civil penalties, unpaid taxes and interest payments if widespread wrongdoing is found.

The agency appears to be taking aim both at companies that took improper tax deductions and at executives who received favorable tax treatment and might have misreported income.

So far, rank-and-file employees who simply received potentially backdated stock options are not in the agency's cross hairs.

"If you were involved in the mischief, you would want to be worried," Mr. Ungar said. "If you weren't involved in it, then you are not in the same situation."

The tax scrutiny is the latest twist in what is perhaps the biggest financial scandal of the year and comes as the agency cracks down on misreported executive pay. The I.R.S. follows several other federal agencies that have begun investigations into the myriad problems that arise from improperly reported or backdated stock option grants.

The Securities and Exchange Commission has said it is examining 80 companies for potential accounting and disclosure problems. On Wednesday, it underlined that focus with new rules on reporting executives compensation. The Justice Department has issued subpoenas to at least 35 companies and last week brought its first criminal charges, against two former executives of Brocade Communications. Now, tax troubles may be next.

By itself, backdating stock option grants is not necessarily illegal. But it can have severe tax consequences separate from potential accounting violations. While ordinary stock options generally qualify for favorable tax treatment, options issued at a discount to the market price do not. Backdating effectively allows such in-the-money options to appear in regulatory filings as if they were ordinary grants.

The I.R.S. is broadly focused on two main areas that may have been abused: performance-based stock options for top executives and incentive stock options that were frequently handed out to the rank and file. Each receives a different type of tax treatment.

Performance-based stock options are generally granted to the five highest-paid executives and can often be worth tens, if not hundreds of millions of dollars when they are cashed out. So long as the options meet certain standards, such as being granted at the market price, companies are allowed to take a tax deduction on that full amount.

But backdating _ effectively granting stock options with a discount _ automatically disqualifies those options from receiving the tax break. Instead, a company's tax deduction would be capped at $1 million for each of the top five executives.

"If these companies have been deducting huge option grants that they actually couldn't deduct, that seems like a big pile of money out there," said Larry R. Langdon, a tax lawyer in Palo Alto, Calif., and a former I.R.S. commissioner.

Improperly awarded incentive stock options could lead to even more tax trouble. Backdating, which grants a discounted option, effectively voids the favorable tax treatment that incentive stock options provide employees, rendering their individual tax returns inaccurate. Companies, meanwhile, could be faulted for underreporting their payroll tax.

"Maybe it is not a widespread problem, but if this happened to five employees, you have five nightmares," said Fred Whittlesey, an executive pay consultant and head of the Compensation Venture Group. "Employees will have a legal and companies will have an ethical responsibility to insulate them from what happened based on actions of a few people."

The I.R.S. assembled a five-member task force to oversee its examinations about two months ago. And in the last few weeks, the Internal Revenue commissioner, Mark W. Everson, directed the agency's corporate auditors to look into potential tax issues as dizens of companies have come forward In a statement, he called on them to "consult closely with the S.E.C. to determine which companies merit scrutiny."

- 32 -

> Last week, I.R.S. officials held their first meeting with Linda Chatman Thomsen, the director of the SEC's enforcement division. She indicated that there were tax issues in the cases that securities regulators were investigating, Mr. Ungar said.
>
> For now, I.R.S. officials are reviewing the files of 30 to 40 of the companies that have publicly disclosed problems, including some already facing scrutiny on other tax issues. Mr. Ungar said it could take months to more than a year before these initial cases are resolved. Much of the information will need to be supplied by the companies themselves, not taken form tax returns. I.R.S. officials have not yet been in touch with the Justice Department about potential tax fraud.

73.     Medarex has been or will be added to the list of companies currently investigated by the IRS because of defendants' rampant backdating practices and the millions of dollars worth of improper deductions taken by the Company.

## MANIPULATED STOCK OPTION GRANTS

74.     The following charts identify various examples of instances between 1996 and 2002 in which options were purportedly dated on or very close to the lowest share price for the month, quarter or year in which they were granted:

a.      Company Stock Price Performance Following Option Granted Dated 4/24/1996:



b.      Company Stock Price Performance Following Option Granted Dated 5/8/1996:



c.    Company Stock Price Performance Following Option Granted Dated 9/4/1997:



d.    Company Stock Price Performance Following Option Granted Dated 10/31/1999:

- 34 -



e.    Company Stock Price Performance Following Option Granted Dated 10/13/2000

(*stock prices are adjusted for 2:1 stock split on 10/19/2000):



f.    Company Stock Price Performance Following Option Granted Dated 1/9/2001:



g.    Company Stock Price Performance Following Option Granted Dated 9/19/2001:



h.    Company Stock Price Performance Following Option Granted Dated 7/10/2002:



## THE TRUTH COMES TO LIGHT REGARDING
## DEFENDANTS' ILLEGAL BACKDATING PRACTICES

75.    On May 24, 2006, in a Form 8-K filed with the SEC, Medarex disclosed to the public

an informal inquiry by the SEC into Medarex's stock option granting practices, stating:

> Medarex, Inc. has received a letter of informal inquiry from the Securities and
> Exchange Commission (SEC) requesting documents related to Medarex's stock
> option grants and practices.

76.    On June 15, 2006, in a subsequent Form 8-K filed with the SEC, Medarex announced

that it had initiated an internal investigation into its stock option granting practices and had appointed

an outside director to oversee.

77.    In the same June 15, 2006 Form 8-K mentioned above, Medarex further disclosed its

receipt of a grand jury subpoena from the U.S. Attorney's Office, District of New Jersey, referencing

information and documentation substantially similar to that requested by the SEC.

78.    On November 6, 2006, Medarex issued a Form 8-K disclosing the findings of the

internal investigation.  Importantly, the investigation uncovered that "…prior to the 2002 effective

- 37 -

date of the Sarbanes-Oxley legislation, the Company had a practice, in many instances, of dating its stock option grants and restricted stock grants as of dates on which the stock price was relatively low, without disclosing the selection in its public filings and without taking a compensation charge."

## DEFENDANTS' ILLEGAL BACKDATING PRACTICES ARE MATERIAL

79.     Defendants' accounting treatment of over $37 million of improperly accounted for stock option expenses is dependent on their conclusion that these errors are immaterial.  Defendants' materiality opinion, however, will likely not be shared by the SEC.  The SEC and applicable accounting rules dictate that issues related to the integrity of management are always material. Defendants' participation in a scheme to backdate options and pay themselves secret paper profits definitely speaks to their integrity.

80.     Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *In re TSC Industries*, 426 U.S. at 449 and in SEC SAB 99, released August 12, 1999.  The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the "total mix" of information made available."  426 U.S. at 449.  SAB 99 further explains that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.

81.     SAB 99 explains that both "quantitative" and "qualitative" factors help determine an item's materiality, rather than purely quantitative factors alone.  Qualitative factors that can make a misstated fact material include, among others:

(a)     whether the misstatement has the effect of increasing management's compensation - for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)     whether the misstatement arises from an item "capable of precise measurement";

(c)      whether the misstatement masks a change in earnings;

(d)      whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

(e)      whether the misstatement affects the registrant's compliance with regulatory requirements.

82.      The improper backdating of stock options is material under each criterion above individually, and is material under all of the criteria collectively.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about Medarex.  This is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's.  Third, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured.  Fourth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower due to greater compensation expenses.  Fifth, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability.  Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses.  Therefore, defendants' illegal stock-option backdating practices are material under these qualitative factors.

83.      Moreover, under applicable accounting rules, a financial misstatement that appears immaterial as to a single reporting period can have a cumulative material impact on other periods.  In such a situation, the misstatement must be corrected, according to SEC SAB 108.  Although SAB 108 is dated September 13, 2006, it draws on years of prior accounting literature and practice that

defendants must take into account in correcting Medarex's financials.  Thus, defendants cannot hide the materiality of their backdating practices by spreading the errors related to those practices over several financial periods and can not claim that "charges are not material to [Medarex's] financial statements in any of the periods in which such charges would have been related ..."

84.    Thus, under applicable SEC and accounting rules and pronouncements, Medarex will likely be required to file a restatement to correct for the $ 37 million in improperly accounted for stock option expenses.  Defendants cannot hide those errors in reclassifications and expense charges.

## DAMAGES TO MEDAREX

85.    As a result of the defendants' improprieties, the Company will need to expend significant sums of money including the following:

(a)    costs incurred to carry out internal investigations, including legal fees paid to outside counsel, accounting firms and consultants;

(b)    costs incurred from responding to potential subpoenas and requests for information from government agencies including the SEC;

(c)    costs incurred from potential fines in connection with governmental investigations;

(d)    costs incurred from increased Directors and Officer's Insurance ("D &O Insurance") premiums as a result of the illegally manipulated stock option grants;

(e)    enormous tax liabilities from improper deductions taken on backdated option grants;

(f)    costs of potential liability to employees whose stock options will be cancelled due to backdating issues;

(g)       costs incurred from the Company's reduced ability to borrow funds or raise capital as a result of potential ratings downgrades;

(h)       costs incurred from directing manpower to potentially restate Medarex's prior financial results to correct for the improperly dated stock option grants.

86.    A recent study from the University of Michigan's Ross School of Business indicates that the fallout from a company's implication in the backdating scandal can result in a company's market value dropping an average of 8%.

## IMPROPER FINANCIAL REPORTING RELATING TO DEFENDANTS' STOCK OPTION MANIPULATIONS

87.    Between 1996 and 2006, the Individual Defendants caused or allowed Medarex to file Form 10-Ks that presented the Company's financial results in violation of GAAP, due to improper accounting for backdated or otherwise manipulated stock option grants.  Specifically, Medarex's compensation expenses were understated and its net earnings were overstated.

88.     The 1996 through 2006 Form 10-Ks were reviewed, prepared and/or endorsed by the Individual Defendants.   The following chart details those Individual Defendants who signed Medarex's public filings with the SEC during the relevant time period:

| Date | Filing | Person(s) Who Signed Public Filings and/or Certified via SOX |
|------|--------|---------------------------------------------------------------|
| 3/27/1997 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Schaller, and Vida |
| 3/31/1998 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Schaller, Michael W. Fanger, Robert Iggulden, W. Leigh Thompson Jr., and Vida |
| 3/30/1999 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Schaller, Michael W. Fanger, Robert Iggulden, W. Leigh Thompson Jr., Frederick B. Craves, and Vida |
| 2/16/2000 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Schaller, Michael W. Fanger, Robert Iggulden, W. Leigh Thompson Jr., Frederick B. Craves, and Vida |
| 4/2/2001 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Schade, Schaller, and Vida |
| 3/28/2002 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Saldarini, Schade, Schaller, Vida, Craves, Fanger, and Thompson |
| 3/31/2003 | 10-K | Signed: Appelbaum, D. Drakeman, Lerner, Saldarini, Schade, Schaller, and Vida; Certified via SOX: D. Drakeman, Schade |
| 3/15/2004 | 10-K | Signed: D. Drakeman, Schade; Certified via SOX: D. Drakeman, Schade |
| 3/16/2005 | 10-K | Signed: D. Drakeman, Schade, Lerner, Appelbaum, Craves, Saldarini, Schaller, and Vida; Certified via SOX: D. Drakeman and Schade |
| 3/15/2006 | 10-K | Signed: D. Drakeman, Schade, Lerner, Appelbaum, Danzon, Saldarini, Schaller, and Vida; Certified via SOX: D. Drakeman and Schade |

89.     The SOX certifications signed by both D. Drakeman and Schade in conjunction with the filing of Medarex's Form 10-K, filed 3/31/2003, contained language certifying the 10-K's compliance with the Securities and Exchange Act of 1934.  Specifically, the certification stated:

"I, [Donald L. Drakeman/Christian S. Schade], certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Medarex, Inc. on Form 10-K for the year ended December 31, 2002 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in such Annual Report of Medarex, Inc. on Form 10-K fairly presents in all material respects the financial condition and results of operations of Medarex, Inc."

**DEFENDANTS' ACTIVELY CONCEALED THEIR ILLEGAL BACKDATING
PRACTICES**

90.     At times relevant hereto, defendants took affirmative steps to conceal their backdating actions by authorizing or otherwise causing the Company to issue proxy statements, Form 3s, Form 4s, Form 5s, Form 10-Qs, Form 10-Ks and other SEC filings and public statements that contained false disclosures concerning the grant dates of options granted to Medarex insiders.  These false disclosures prevented plaintiff from recognizing that Medarex insiders were illegally backdating their stock option grants.

91.     Indeed, prior to the March 18, 2006 *Wall Street Journal* article, titled "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable.  Luck – or something else?", the public consensus was that favorable option timing could be largely explained by an insider's ability to predict that favorable company news was coming and that insiders were timing grants to take advantage of it.  This consensus was not challenged until academic research that included examinations of thousands of companies revealed that it was likely that grant dates had been filled in retroactively.

92.     Accordingly, due this public consensus, shareholders were prevented from recognizing earlier the validity of the herein alleged claims against the Individual Defendants.  Even after that article was published, there were insufficient warnings that implicated Medarex in the backdating scandal.  The first public disclosure of backdating specifically at Medarex did not occur until May 24, 2006.

93.     Further, plaintiff's ignorance of defendants' illegal backdating practices was not attributable to a lack of due diligence.  It would be unreasonable to expect plaintiff, a typical shareholder, to undertake costly and extensive academic research and statistical analysis when

defendants' false public statements indicated that stock options were being properly granted. In any case, plaintiff was entitled to rely upon the truthfulness of the disclosures contained with Medarex's public statements and SEC filings.

94.     Within weeks of the May 24, 2006 public disclosure of backdating practices at Medarex, plaintiff conducted an investigation of defendants' prior option grants, discovered numerous suspicious grants dated at extremely favorable exercise prices and expeditiously brought this action on behalf of Medarex to preserve the Company's claims against the wrongdoers responsible for illegal backdating.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of Medarex to redress injuries suffered, and to be suffered, by Medarex as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Medarex is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff will adequately and fairly represent the interests of Medarex in enforcing and prosecuting its rights.

97.     Plaintiff is and was an owner of Medarex stock during the times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and currently remains a shareholder of the Company.

98.     The Medarex Board currently consists of seven directors: defendants Appelbaum, D. Drakeman, Danzon, Lerner, Saldarini, Schaller, and Vida. The following five directors are incapable

of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

      a.   D. Drakeman, because he is directly interested in the improperly backdated stock option grants complained of herein, and because he presides, in his principal professional occupation, as President and Chief Executive Officer of the Company.  Pursuant to his positions as President and Chief Executive, D. Drakeman receives more than $1.1 million per year in salary and cash bonuses, plus thousands of shares of Medarex restricted stock and stock options. Accordingly, D. Drakeman is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute an action against the other defendants, particularly the New Compensation Committee Defendants;

      b.   Appelbaum, because he is directly interested in the improperly backdated stock option grants complained of herein.  Moreover, by colluding with the Director Defendants as alleged herein, Appelbaum has demonstrated that he is unable or unwilling to act independently of the Director Defendants;

      c.   Lerner, Schaller, and Vida, because as members of the Compensation Committee and the New Compensation Committee, they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein.  Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Lerner, Schaller, and Vida have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants;

      d.   Lerner and Schaller because as members of the Audit Committee they directly participated in and approved the misconduct alleged herein and are substantially likely to be held liable for breaching their fiduciary duties, as alleged herein. Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Lerner and Schaller have demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants

99.    The Medarex Board was responsible for approving the compensation awarded to Medarex's insiders.  This compensation included the stock options that were secretly backdated by Medarex insiders.  Therefore, the entire Board is liable for failing to fulfill its fiduciary duties to Medarex in approving the option grants as dated.  The Board should have properly informed itself of the circumstances surrounding the options granted to Medarex insiders before approving them. Indeed, these options, dated at the Company's lowest closing price for the respective month in which

they were granted, were routinely approved by the Board, establishing that the Board's decisions were not informed.  Accordingly, the Board's decision to approve the options was not the product of valid business judgment.

100.    As a result of each of the defendants' access to and review of internal corporate documents, attendance at Board meetings, and conversations and connections with other corporate officers, employers and directors, each defendant knew and consciously disregarded, or was recklessly and grossly negligent in not knowing, of the adverse, non-public information regarding the improper accounting.  Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

101.    The Director Defendants of Medarex, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Medarex's stockholders.  In the very least, the Director Defendants of Medarex recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

102.    In order to bring this suit, all of the directors of Medarex would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

103.    The acts complained of constitute violations of the fiduciary duties owed by Medarex's officers and directors and these acts are incapable of ratification.

104.    Medarex has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; however, the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for the herein alleged wrongful

conduct in an attempt to recover for Medarex any part of the damages Medarex has and will continue to suffer.

105.    In order to bring this suit, all of the directors of Medarex would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

106.    Medarex's current and past officers and directors caused the Company to purchase and are protected by directors' and officers' liability insurance, protecting them against personal liability for their acts of mismanagement, abuse of control, and breach of fiduciary duty alleged in this Complaint.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions known as, *inter alia*, the "insured versus insured exclusion," that eliminate coverage for any action brought directly by Medarex against these Individual Defendants.  As a result, if these directors of Medarex were to sue themselves or the officers of Medarex, directors' and officers' insurance protection coverage would be non-existent. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, it is imperative that demand be excused, because the Individual Defendants in this case will not, on their own, bring suit in the face of large, uninsured, personal liability.

107.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Medarex any damages resultant from the wrongdoing alleged by plaintiff herein.

108.    Plaintiff has not made any demand on shareholders of Medarex to institute this action since such demand would be a futile and useless act for the following reasons:

a.        Medarex is a publicly held company with over 122.2 million shares outstanding, and thousands of shareholders;

b.        making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.        making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against Defendants D. Drakeman and Schade for Disgorgement under the Sarbanes-Oxley Act of 2002

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    Section 304 of the Sarbanes-Oxley Act of 2002 provides that if a public company prepares an accounting restatement due to material non-compliance with any financial reporting requirement under federal securities laws, and such non-compliance resulted from misconduct, then the company's CEO and CFO must reimburse the company for certain payments made by the company to those executives.  Section 304, entitled "Forfeiture of Certain Bonuses and Profits," provides in full:

(a)      **Additional compensation prior to noncompliance with commission financial reporting requirements.**  If an issuer is required to prepare an accounting restatement due to the material non-compliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, *the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for -*

1.       any bonus or other incentive-based or equity-based compensation received  by that person from the issuer during the 12-month period following the first public  issuance  or  filing  with  the  Commission

- 48 -

(whichever first occurs) of the financial document
embodying such financial reporting requirement; and

2.      any profits realized from the sale of securities
of the issuer during that 12-month period.

(b)    **Commission exemption authority.**  The Commission may
exempt any person from the application of subsection (a), as it
deems necessary and appropriate.

111.    Medarex will likely restate its financial statements filed from 1996 to the present due to the material non-compliance of such statements with federal securities laws reporting requirements. These restatements resulted from "misconduct" within the meaning of Section 304 of the SOX. As a result, defendants D. Drakeman, as the President, the CEO and a director of Medarex since 1987, and Schade, as the current Senior Vice President, Finance and Administration, and CFO, who both certified, pursuant to SOX, Medarex's 2003-2006 10Ks, are required to reimburse Medarex for all bonuses or other incentive-based or equity-based compensation received by them from the Company during the period July 30, 2002 (the date of enactment of the SOX) through the present.

112.    Further, defendants D. Drakeman and Schade also are liable to Medarex for any profits realized from the sales of securities by the Company during that same period of time.

113.    Defendants D. Drakeman and Schade are also liable to plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of Medarex.

## COUNT II

### Against the Director Defendants for Violation of Section 14(a)

of the Securities and Exchange Act of 1934

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    The Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading written statements to shareholders which were contained in the Company's proxy statements issued on: April 22, 1997; April 16, 1998; April 16, 1999; April 11, 2000; April 16, 2001; April 25, 2002; April 18 2003; April 9, 2004; April 8, 2005; and April 10, 2006 (collectively referred to as the " Proxies").  The April 22, 1997 proxy included a proposal to the shareholders to approve and a description of the 1997 stock option plan.  Similarly, the April 16, 1999, April 11, 2000, April 16, 2001, April 25, 2002, April 18, 2003, April 8, 2005, and April 10, 2006 had like provisions concerning adoption of new or amendment of existing stock option or equity incentive plans.  However, all of the Proxies misrepresented and failed to disclose that the Company's executives were engaged in improper backdating and otherwise manipulation of stock options. Furthermore, the Proxies each failed to disclose to the public that the Medarex Board was approving the aforementioned improperly backdated options.  By reasons of the conduct alleged herein, the Individual Defendants, who either directly or indirectly caused or allowed the issuance of the Proxies violated §14(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Medarex misled and/or deceived its shareholders by falsely portraying how the plans would be administered.

116.    Additionally, the Proxies failed to accurately portray the compensation paid to Medarex's insiders.  The compensation presented did not take into account defendants' illegally backdated options and, thus, false compensation figures were published and republished in various proxies from 1996 to the present.

117.    This information was material to Medarex's shareholders in determining whether or not to approve the plans and amendments contained within the Proxies.  Furthermore, this information was material to the integrity of the proposed candidates for election as directors of the Board.

118.    Relevant guidance on whether accounting items are material is found in the Supreme Court's ruling in *In re TSC Industries*, 426 U.S. at 449 and in SEC SAB 99, released August 12, 1999.  The Court ruled in *TSC Industries* that a fact is material to investors if there is "a substantial likelihood that the … fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available."  426 U.S. at 449.  SAB 99 further explains that ruling by summarizing the law and accounting rules on materiality as they have existed throughout the defendants' actions.

119.    SAB 99 explains that both "quantitative" and "qualitative" factors, rather than purely quantitative factors alone, help determine an item's materiality.  Qualitative factors that can make a misstated fact material include, among others:

a.    whether the misstatement has the effect of increasing management's compensation; for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

b.    whether the misstatement arises from an item "capable of precise measurement;"

c.    whether the misstatement masks a change in earnings;

d.    whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability; and

e.      whether the misstatement affects the registrant's compliance with regulatory requirements.

120.    The improper backdating of stock options is material under each criterion above individually, and under all of the criteria collectively.  First, there is a substantial likelihood that the reasonable investor would consider that facts about backdating significantly alter the total mix of information about Medarex.  This is because, among other things, improper backdating of stock options reflects the degree to which the Company's insiders promote their own interests ahead of the Company's.  As the SEC ruled in the administrative case *In re Franchard Corp.*, the integrity of a company's management "is always a material factor."  42 S.E.C. at 163.  Second, the improper backdating increased the management's and directors' compensation, and reduced requirements for those insiders to gain bonuses and incentive compensation.  Accordingly, third, the improper backdating affects the incentives for management and directors to improve the Company's operations and profitability.  This decreased incentive for management led directly to a loss in growth and productivity for the Company.  Forth, the correct dates of option grants and the correct closing prices for stock on those days can be precisely recorded and measured.  Fifth, the improper backdating of stock options masked the Company's true net income, which should have been reported as lower, due to greater compensation expenses.      Sixth, the improper backdating of stock options violates financial-reporting requirements of public companies and violates tax laws related to compensation expenses.  Thus, defendant's illegal stock-option backdating practices are material under these qualitative factors and should have been disclosed in the Proxies.

121.    Plaintiff, on behalf of Medarex, thereby seeks relief for damages inflicted upon the Company in connection with the improper approval of the plans and amendments, included within the aforementioned proxies, due to the false, misleading and incomplete proxy materials.  Plaintiff, on

behalf of Medarex, further seeks: (1) a disgorgement of the compensation paid to the Individual Defendants in connection with the plans described in and approved via the Proxies; and (2) to void the election of those directors whose integrity was falsely portrayed in the Proxies.

**COUNT III**

**Derivatively Against All Defendants for Violation of §10(b)
of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    Between, at least, 1996 and the present, the Individual Defendants disseminated or approved financial statements that did not disclose either the stock option backdating practices that were occurring at Medarex or the resulting effects of those practices on the Company's financial results.  Specifically, Medarex's financial statements included financial results that did not properly account, as required under GAAP, for stock options granted below fair market value.  The Individual Defendants knew or recklessly disregarded the fact that the financial statements contained misrepresentations, as a result of the stock option backdating practices, and failed to disclose material facts necessary to clarify and disclose to the public the above cited misrepresentations.

124.    During the period of 1996 to the present, while in possession of material non-public information, the Director Defendants and Option Recipient Defendants approved grants, totaling over 3.4 million, of improperly backdated stock options to the Option Recipient Defendants. These defendants, including both the Director Defendants and Option Recipient Defendants, misappropriated Medarex's proprietary information and violated their so-called "abstain or disclose"

duties under the federal securities laws when they approved the improperly backdated Medarex stock options without disclosing to the public the information alleged herein to have been concealed.

125.    Accordingly, the Company's share price was artificially inflated during this period due to the improper accounting treatment of the backdated options granted with exercise prices below fair market value.  Under applicable accounting rules, these options should have been expensed during their respective vesting periods.  Thus, Medarex's 1996 through 2006 financials falsely portrayed the Company's true financial results.

126.    As such, the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

> a.    employed devices, schemes and artifices to defraud;

> b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> c.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Medarex and others in connection with their purchases of Medarex common stock during the Relevant Period.

127.    As a direct and proximate result of these Individual Defendants' wrongful conduct, Medarex suffered damages in connection with its granting of Medarex stock options during 1996 through 2006.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder.

**COUNT IV**

**Against All Defendants for Unjust Enrichment**

128.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense and to the detriment of Medarex.  These wrongful acts included the approval by Director Defendants of improperly backdated stock options, the receipt by Option Recipient Defendants of improperly backdated stock options, and the receipt of undeserved compensation by the Officer Defendants in connection with the improperly backdated stock options.

130.     Plaintiff, as a shareholder and representative of Medarex, seeks restitution from the Individual Defendants and, accordingly, an order of this Court disgorging all profits, benefits and other compensation obtained by each of these defendants as a result of their wrongful conduct and fiduciary breaches.

### COUNT V

**Against All Defendants for Breach of Fiduciary Duty for Approving
Improperly Dated Stock Option Grants to Medarex's Executive Officers**

131.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.      By reason of their fiduciary relationships, the Individual Defendants owed and owe Medarex fiduciary obligations and the highest obligation of good faith, fair dealing, loyalty and due care.

133.     The Individual Defendants, each and together, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

134.     Each of the Individual Defendants had actual or constructive knowledge that they had approved both the improper backdating of stock option grants and the corresponding issuance of

inaccurate financial results.   Furthermore, each of the Individual Defendants had actual or constructive knowledge that the aforementioned issuances of financial results failed to properly account for the improper stock option grants.   Moreover, each of the Individual Defendants failed to correct the public deception caused by the above activity and to take action designed to prevent further like improprieties.

135.   Accordingly, these actions, as explicated herein, could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests. Therefore, business judgment rule protection should not be granted to the Individual Defendants for the improper actions alleged herein.

136.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Medarex has sustained significant damages.

137.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

138.   Plaintiff, on behalf of Medarex, has no adequate remedy at law.

## COUNT VI

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Granting Backdated Stock Options and Misappropriating Information

139.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140.   At the time of the stock option grants, as set forth herein, the Option Recipient Defendants knew non-public information and, for personal gain, improperly backdated Medarex's stock options on the basis of such information.

- 56 -

141.    The misappropriated information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Individual Defendants used for their own benefit when they improperly misappropriated it and, thereby, granted improperly backdated stock options to the Option Recipient Defendants.

142.    At the time of their stock sales, the Individual Defendants knew that the Company's revenues were materially overstated because of the undisclosed stock option and other related compensation expenses.  The Individual Defendants' granting of improperly backdated stock options while in possession and control of this material adverse and non-public information was a breach of their fiduciary duties of loyalty and good faith.

143.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Individual Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Individual Defendants obtained thereby.

## COUNT VII

### Against All Defendants for Abuse of Control

144.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

145.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Medarex, for which they are legally responsible.

146.    As a direct and proximate result of the Individual Defendants' abuse of control, Medarex has sustained significant damages.

147.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    Plaintiff, on behalf of Medarex, has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Gross Mismanagement

149.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

150.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Medarex in a manner consistent with the operations of a publicly held corporation.

151.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Medarex has sustained significant damages.

152.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

153.    Plaintiff, on behalf of Medarex, has no adequate remedy at law.

## COUNT IX

### Against All Defendants for Waste of Corporate Assets

154.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

155.    As a result of the improprieties alleged herein and the Individual Defendants' coinciding and blatant failure to properly consider the interests of the Company and its public shareholders, defendants have caused Medarex to waste valuable corporate assets and incur costs to, at a minimum, conduct investigations, hire outside counsel, employ accounting firms and consultants,

- 58 -

and direct manpower to the task of restating Medarex's past financials to correct for the improperly backdated stock option grants.

156.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157.    Plaintiff, on behalf of Medarex, has no adequate remedy of law.

## COUNT X

### Against All Defendants for an Accounting

158.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

159.    At all relevant times, the Individual Defendants, as directors and/or officers of Medarex, owed the Company and its shareholders fiduciary duties of good faith, care, candor and loyalty.

160.    In breach of their fiduciary duties owed to Medarex and its shareholders, the Individual Defendants authorized the granting of backdated Medarex stock options to themselves.  By this wrongdoing, the Individual Defendants breached their fiduciary duties owed to Medarex and its shareholders.

161.    The Individual Defendants possess complete and unfettered control over both the improperly issued stock option grants as well as the books and records of the Company detailing the improperly backdated stock option grants.

162.    Plaintiff demands an accounting be made of all stock option grants made to the Individual Defendants, including, without limitation, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted

to the defendants, and the disposition of any proceeds received by the Individual Defendants via sale, exercise or other disposition of backdated stock option grants received by the Individual Defendants.

163.    As a result of Individual Defendants' misconduct, Medarex has been substantially injured and damaged financially and is entitled to a recovery, including the proceeds of all improperly granted options which have been exercised and sold, as a result thereof.

## COUNT XI

### Against the Officer and Director Defendants for Rescission

164.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

165.    As a result of the acts alleged herein, the stock option contracts between the Individual Defendants and Medarex entered into during the relevant period were obtained through the Individual Defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement and abuse of control.  Further, the backdated stock options were illegal, in that they were backdated in violation of applicable federal and state law.  Moreover, Individual Defendants authorized these options in breach of the terms of the publicly filed employment agreements and the Company's stock option plans, which were also approved by Medarex shareholders and filed with the SEC.  Consequently, the option grants are void.

166.    All contracts, entered into during times relevant hereto, which provide for stock option grants between the Individual Defendants and Medarex, should, therefore, be rescinded, with all sums, proceeds and profits under such contracts returned to the Company.  Furthermore, all such executory contracts should be cancelled and declared void.

## COUNT XII

### Against All Defendants for Constructive Trust

- 60 -

167.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.     As a result of the acts alleged herein, the Individual Defendants authorized granting to themselves and other Medarex insiders backdated or otherwise manipulated equity or incentive based compensation.  In effect, these backdated options or otherwise manipulated equity or incentive based compensation grants constituted illegal compensation in violation of Medarex's stock option plans, employment contracts, and other compensation policies.

169.     The Company has a right for the return of this compensation because it was illegally authorized by the defendants and paid out of the Company's assets.

170.     The Individual Defendants and other Medarex insiders profited from the illegally backdated options by wrongful acts.

171.     Accordingly, plaintiff seeks a declaratory judgment that the illicit stock options, along with all proceeds derived from the exercise thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment.

B.      Declaring that defendants D. Drakeman and Schade are liable under § 302 of the SOX, and requiring them to reimburse Medarex for all bonuses or other incentive based or equity based compensation received by them during the period in which Medarex will restate its financial results;

C.      Declaring and decreeing that the Director Defendants caused the Company to act in violation of §14(a) of the Exchange Act;

D.      Declaring that the Individual Defendants are liable under §10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder, and awarding Medarex damages;

E.      Directing Medarex to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Medarex and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      a proposal to ensure that all stock options granted to executive and non-executive employees are properly awarded, valued and administered;

3.      control and limit insider stock selling;

4.      a provision to permit the shareholders of Medarex to nominate at least three candidates for election to the Board; and

5.      appropriately test and then strengthen the internal audit and control functions.

F.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

- 62 -

statutory provisions sued hereunder, including attaching, impounding or otherwise restricting the proceeds of defendants' trading activities, backdated stock options or their other assets so as to assure that plaintiff, on behalf of Medarex, has an effective remedy;

G.      Directing an accounting of all undisclosed backdated stock options granted, directing that all unexercised options granted to defendants between 1996 and 2002 be cancelled, ordering returned to the Company the financial gains obtained via the exercise of such stock options, and ordering Medarex to revise the Company's financial statements to reflect the truth concerning these option grants;

H.      Declaring void all stock options that were issued to the Individual Defendants and illegally backdated;

I.      Declaring that defendants' illicit and illegally obtained stock options, and all proceeds derived from the exercise or sale thereof and any assets or other property acquired in connection therewith, are and have been held in constructive trust by defendants for the Company's benefit from the true grant date of the manipulated stock options and other equity or incentive based compensation;

J.      Awarding to Medarex restitution from the Individual Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants through the improper backdating of stock option grants;

K.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

L.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  November 14, 2006

Respectfully,

**KANTROWITZ, GOLDHAMER & GRAIFMAN**
By:   s/Gary S. Graifman
        Gary S. Graifman
210 Summit Avenue
Montvale, New Jersey 07645
(201) 391-7000

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
Tzivia Brody
6 East 45th Street
New York, New York 10017
(212) 687-7230 (Tel)
(212) 490-2022 (Fax)

**WEISS & LURIE**
Joseph H. Weiss
551 Fifth Avenue
New York, New York  10176
(212) 682-3025 (Tel)
(212) 682-3010 (Fax)

**Attorneys for Plaintiff**